# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00261-CV

**Texas Department of Family and Protective Services; Henry Whitman, in His Official Capacity as DFPS Commissioner; Texas Health and Human Services Commission; Charles Smith, in his Official Capacity as HHSC Executive Commissioner; Corrections Corporation of America; and The GEO Group, Inc., Appellants**

**v.**

**Grassroots Leadership, Inc.; Gloria Valenzuela; E. G. S., for herself and as next friend for A. E. S. G.; F. D. G., for herself and as next friend for N. R. C. D.; Y. E. M. A., for herself and as next friend for A. S. A.; Y. R. F., for herself and as next friend for C. R. R.; S. J. M. G., for herself and as next friend for J. C. M.; K. G. R. M., for herself and as next friend for A. V. R.; C. R. P., for herself and as next friend for A. N. C. P.; B. E. F. R., for herself and as next friend for N. S. V.; S. E. G. E., for herself and as next friend for G. E. A.; Leser Julieta Lopez Herrera, for herself and as next friend for A. B.; and Rose Guzman de Marquez, for herself and as next friend for D. R., Appellees**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-15-004336, HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This appeal concerns several parties' challenges to the validity of a rule promulgated by the Texas Department of Family and Protective Services (DFPS). The challenged rule requires "family residential centers" (FRCs)—which serve as detention centers for immigrants and their minor children who are subject to federal civil-immigration proceedings—to be licensed as "general residential operations" (GROs) and, thus, subject to the State's minimum standards for such

facilities.[1]  As they did below in a plea to the jurisdiction, appellants DFPS and its Commissioner

and the Texas Health and Human Services Commission (HHSC) and its Executive Commissioner

contend that the trial court should not have reached the merits of the rule challenge because each

plaintiff below lacked standing to confer jurisdiction on the trial court.  We agree with appellants

and, for the following reasons, reverse the trial court's judgment and render judgment granting

appellants' plea to the jurisdiction and dismissing appellees' rule-challenge claims with prejudice.

## BACKGROUND[2]

In 1985 a class of plaintiffs initiated a lawsuit against U.S. Immigration and Customs

Enforcement (ICE) and other defendants in the District Court of Central California; many years

later, the parties entered into a court-approved settlement of the lawsuit (the "*Flores* Settlement

Agreement").  *See Flores v. Lynch*, 828 F.3d 898, 901–03 (9th Cir. 2016).  The *Flores* Settlement

Agreement "set[] out nationwide policy for the detention, release, and treatment of minors in the

custody of [ICE]."  *Id.* at 901.  Under the *Flores* Settlement Agreement, unless detention is necessary

---

[1]  The Providers sued the Texas Department of Family and Protective Services (DFPS) and its Commissioner, Henry Whitman, because DFPS was at the time the agency that handled licensing of child-care facilities.  Effective September 1, 2017, appellant Texas Health and Human Services Commission (HHSC) assumed responsibility for child-care licensing as a result of legislation directing that DFPS become a stand-alone agency that is separate from HHSC and will regulate child-care operations only to the extent of investigating child abuse, neglect, and exploitation.  *See* Act of May 22, 2017, 85th Leg., R.S., ch. 316, §§ 22, 24, 38, 2017 Tex. Gen. Laws 601, 607, 612. In accordance with this transfer of responsibility, the relevant rules have been transferred to Title 26 of the Texas Administrative Code.  *See* 43 Tex. Reg. 909 (2018) (announcing transfer of rules that contain minimum standards for child-care operations from DFPS to HHSC); *see also, e.g.*, 26 Tex. Admin. Code § 748.7 (2018) (Health & Human Servs. Comm'n, How are these regulations applied to family residential centers?).

[2]  The facts in this section are derived from recitations in the trial court's Amended Final Judgment.

2

to secure a minor's appearance in court or to ensure safety, ICE must promptly release the minor to an adult family member or other suitable individual or entity. *Id.* at 902–03. Also, ICE must temporarily place all unreleased minors in an unsecure and "licensed program"—i.e., a facility that is "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." *Id.* at 903.

In response to increased numbers of Central Americans arriving at the U.S.-Mexico border during the summer of 2014, and to deter further arrivals, ICE adopted a policy of detaining all female-headed immigrant families. *Flores v. Johnson*, 212 F. Supp. 3d 864, 869 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded sub nom. Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016). Detention under ICE's new policy would last for the duration of the deportation proceedings that determine if the mothers and children are entitled to remain in the United States. *Id.* Notwithstanding the *Flores* Settlement Agreement, ICE's new policy provided that the immigrants would be detained in secure, unlicensed facilities. *Id.* In federal court, the new ICE policy was held to violate the *Flores* Settlement Agreement. *See id.* at 879 ("Defendants cannot be in substantial compliance with the Agreement because the facilities are secure and non-licensed."), *aff'd in relevant part*, 828 F.3d at 908–10.

ICE opened three new family detention facilities, two in south Texas—known as "Dilley" and "Karnes" due to their locations—and one in New Mexico, which was closed shortly thereafter. *Flores*, 828 F.3d at 904. This lawsuit concerns the Dilley and Karnes facilities, which are operated by private prison companies under contract with ICE. Appellant Corrections Corporation of America (currently known as CoreCivic) operates the Dilley facility; appellant GEO Group, Inc.,

3

operates the Karnes facility. The Karnes and Dilley facilities began detaining immigrant women and children in 2014.

DFPS did not attempt to regulate FRCs in Texas until it adopted an emergency rule on September 2, 2015. Before that time, DFPS had historically and consistently acknowledged that it lacked authority to license FRCs and declined to do so based upon that lack of authority. Shortly after the emergency rule was adopted, Grassroots Leadership initiated this lawsuit to challenge the emergency rule. The trial court issued a temporary injunction prohibiting DFPS from implementing the emergency rule but expressly permitting it to proceed through the traditional rulemaking procedures outlined in the Texas Government Code. *See* Tex. Gov't Code §§ 2001.023–.029. DFPS followed the procedures for rulemaking and subsequently adopted Rule 748.7 (referred to by the parties and in the trial court's judgment as the "FRC Rule"). *See* 26 Tex. Admin. Code § 748.7 (2018) (Health & Human Servs. Comm'n, How are these regulations applied to family residential centers?) (formerly codified at 40 Tex. Admin. Code § 748.7).

Grassroots Leadership amended its petition several times while the cause was pending below, adding additional plaintiffs: Gloria Valenzuela, who operates a day-care facility in El Paso, and several detainees, on behalf of themselves and their minor children. CoreCivic and GEO Group intervened as defendants. Appellees' live petition asserts the following causes of action against appellants: (1) a challenge to the FRC Rule as allegedly exceeding DFPS's statutory authority in contravention of the Human Resources Code, *see* Tex. Gov't Code § 2001.038; (2) a request for declaratory relief under the Uniform Declaratory Judgments Act (UDJA), *see* Tex. Civ. Prac. &

Rem. Code §§ 37.001–.011; and (3) and a claim that DFPS's attempts to issue licenses to Karnes and Dilley constitute ultra vires acts.[3]

Appellees' live petition outlines their primary contentions for challenging the validity of the FRC Rule: the rule exceeds DFPS's statutory authority; DFPS did not provide a reasoned justification, *see* Tex. Gov't Code 2001.033(a)(1); the rule's provisions prolong the detention of minors; the rule allows for the detention of minors in violation of Family Code section 54.011(f), *see* Tex. Fam. Code § 54.011(f) ("[A] nonoffender, including a person who has been taken into custody and is being held solely for deportation out of the United States, may not be detained for any period of time in a secure detention facility . . . ."); and the rule "authoriz[es] conditions of detention for mothers and children . . . by permitting exceptions to minimum child safety standards established by DFPS itself . . . that increase their risk of physical harm and fear for their physical safety." Plaintiffs below sought a declaration invalidating the rule and declaring that DFPS has no authority to issue licenses to Dilley and Karnes.

Appellants filed pleas to the jurisdiction claiming that appellees lack standing to assert their claims. In its Final Amended Judgment, the trial court denied the pleas to the jurisdiction as to appellees' rule challenge and declared the FRC Rule invalid because it "contravenes" Human Resources Code section 42.002(4) and "runs counter to the general objectives of the [] Human

---

[3] Only the appellees' rule challenge is before us on appeal, as the trial court dismissed appellees' UDJA claim when granting appellants' plea to the jurisdiction, and the trial court's Amended Final Judgment, while not specifically ruling on the ultra vires claims, "dispose[d] of all parties and claims." *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001) (noting that judgment issued without conventional trial is final if it actually disposes of all claims and parties). Appellees have not cross-appealed the trial court's judgment with respect to their declaratory-judgment and ultra vires claims.

Resources Code." The Final Amended Judgment also ordered DFPS and HHSC to "refrain from issuing licenses under the FRC Rule until the Court of Appeals issues a decision on appeal or further Order of the Court" but to "continue to investigate and report any allegations of abuse or neglect, standards deficiencies, or violation(s) of rule of law at Karnes and Dilley during the pendency of any appeal."

## DISCUSSION

Appellants contend that, before we address the merits of appellees' rule challenge, we must determine whether any of the appellees has standing. Because standing is a component of subject-matter jurisdiction, we agree that we must first consider the issue. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993) (noting that appellate courts consider plaintiff's standing under same standard by which they review subject-matter jurisdiction generally, which requires plaintiff to allege facts that affirmatively demonstrate court's jurisdiction to hear cause). Standing requires "a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2012); *see Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 739 (Tex. App.—Austin 2014, pet. dism'd).

To satisfy the supreme court's standing test, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Heckman*, 369 S.W.3d at 154 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The standing inquiry "begins with the plaintiff's alleged injury." *Id.* at 155. That is, the plaintiff must plead that she is *personally* injured, demonstrating facts that she, herself (rather than a third

6

party or the public at large) suffered the injury. *Id.* As for the injury itself, it "must be concrete and particularized, actual or imminent, not hypothetical." *Id.* (quoting *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008)). Standing is determined at the time suit is filed in the trial court, and subsequent events do not deprive the court of subject-matter jurisdiction. *Texas Ass'n of Bus.*, 852 S.W.2d at 446 n.9. We review the denial of a plea to the jurisdiction de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

We now consider whether each appellee has standing—that is, whether each has a concrete and particularized injury fairly traceable to the FRC Rule that is likely to be redressed by the requested relief.

### Whether Grassroots Leadership has standing

Per the testimony of its Executive Director, Grassroots Leadership is a non-profit association focused on "advocating for policies that reduce reliance on incarceration and detention." Grassroots Leadership has alleged that it opposes the FRC Rule because it would allow Karnes and Dilley to detain children for longer periods of time under lower standards of care than are provided to children in all other Texas GROs and that the association has been forced to "divert resources to opposing the FRC Rule's adoption and the licensure of private prisons as childcare facilities."

An associational plaintiff can sue on behalf of its members, in which case it must demonstrate standing based on at least one freestanding claim by a member. *Texas Ass'n of Bus.*, 852 S.W.2d at 446–47. However, Grassroots Leadership has not asserted that it has any members and, therefore, cannot meet the requirements of the associational test for standing. *See id.* (adopting U.S. Supreme Court's associational-standing test requiring, relevantly, that association's members

7

would otherwise have standing to sue in their own right and citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Texas Soc'y of Prof'l Eng'rs v. Texas Bd. of Architectural Exam'rs*, No. 03-08-00288-CV, 2008 WL 4682446, at \*3–4 (Tex. App.—Austin Oct. 24, 2008, no pet.) (mem. op.) (declining to find standing where plaintiff association could not meet associational-standing test). Accordingly, Grassroots Leadership is required to establish standing based on "concrete and particularized" injury to itself, as an entity. *See Heckman*, 369 S.W.3d at 155; *City of San Antonio v. Headwaters Coal., Inc.*, 381 S.W.3d 543, 549–50 (Tex. App.—San Antonio 2012, pet. denied) (concluding that nonprofit corporation that owned land immediately upstream from city's proposed drainage project had standing to bring injunction suit because it showed it would suffer particularized injury distinct from that suffered by general public).

Grassroots Leadership alleges that its injury here is that it was required to "divert volunteer and financial resources from its other work, including . . . starting visitation programs to detained migrants at immigration detention centers around Texas, an advocacy campaign to end the immigration detention bed quota, and producing a research report on federal-court prosecution of migrants at the border." In other words, Grassroots Leadership asserts that it spent money on its advocacy activities related to opposing the private detention facilities. However, these activities are not sufficient to meet the test for individualized standing, as the injury it claims to have suffered—the expenditure of advocacy resources—is too attenuated from any legally protected interest it could possibly have in the FRC Rule, not itself being subject to the rule or directly affected by its provisions. *See Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("[b]y particularized, we mean that the injury must affect the plaintiff in a personal and individual way") (citing *Lujan v.*

8

*Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992)); *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 707–08 (Tex. 2001) (plaintiff must be "personally aggrieved" to establish standing). Furthermore, Grassroots Leadership's choice to expend advocacy resources to challenge the FRC Rule and the detention centers generally—assuming that such "injury" were sufficiently concrete and particularized—cannot reasonably be considered "fairly traceable" to DFPS's or HHSC's conduct in promulgating or enforcing the rule.

While Grassroots Leadership cites *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), for its contention that its advocacy expenditure creates standing, we note that the standing test outlined in *Havens* (requiring the plaintiff to have a "personal stake" in the outcome of the controversy, which was met by the organization's allegation that it was required to spend money to counteract governmental policy) applies specifically to claims brought under the federal Fair Housing Act.[4] *See id.* at 378; *see also Midpeninsula Citizens for Fair Hous. v. Westwood Inv'rs*, 221 Cal. App. 3d 1377, 1385 (Cal. Ct. App. 1990) (declining to expand *Havens* beyond Fair Housing Act damages claims because it did not address constitutional standing). This is not a Fair Housing

---

[4] Grassroots Leadership also asserts that it has standing to redress the violation of its "statutory rights" under the Administrative Procedure Act (APA) in that DFPS allegedly did not "seriously consider" Grassroots Leadership's objections and comments or give adequate justification for disregarding them when promulgating the final rule. *See* Tex. Gov't Code §§ 2001.029, .030; *Planned Parenthood v. Gee*, 862 F.3d 445, 455 (5th Cir. 2017) ("[V]iolation of a statutory right, even standing alone, may be sufficient to satisfy the injury requirement . . . ."). We reject this argument because the supreme court has held that the APA does not extend the scope of constitutional standing. *See Finance Comm'n v. Norwood*, 418 S.W.3d 566, 582 n.83 (Tex. 2013) ("The [APA] does not purport to set a higher standard than that set by the general doctrine of standing, and it cannot be lower, since courts' constitutional jurisdiction cannot be enlarged by statute."). Morever, the case on which Grassroots Leadership relies speaks to the alleged deprivation of a "statutory right of entitlement" as the basis of standing, *see Gee*, 862 F.3d at 455; here, Grassroots Leadership has no statutory right under the APA that rises to the level of an entitlement.

Act case, and we decline to expand *Havens* beyond such claims. Therefore, plaintiffs must meet the particularized injury test adopted by the Texas Supreme Court and the United States Supreme Court since *Havens*. *See Brown*, 53 S.W.3d at 305. Because Grassroots Leadership has not pleaded a particularized injury, we conclude that it lacks standing to bring this rule challenge.

***Whether Valenzuela has standing***

Valenzuela operates a small day-care facility in El Paso and asserts standing based on "license disparagement," contending that the licensing of the FRCs as GROs will affect parents' perceptions of her day-care license, perhaps causing them to choose unlicensed child care based on their negative perceptions of the "jail-like" FRCs. *See Texas State Bd. of Podiatric Med. Exam'rs v. Texas Orthopaedic Ass'n*, No. 03-04-00253-CV, 2004 WL 2556917, at *1 n.3 (Tex. App.—Austin Nov. 12, 2004, no pet.) (mem. op.) (holding that association of orthopedists met injury prong of standing test to challenge rule granting podiatrists right to perform procedures that otherwise would be considered practice of medicine based on association's allegation that privilege of practicing medicine would be diminished because podiatrists are neither licensed nor trained to practice medicine); *see also Intercontinental Terminals Co. v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (in case where standing was not at issue, court concluded that where one business competitor alleged loss of reputation and goodwill as injury in dispute with another competitor about use of shared rail line, complaining competitor sufficiently alleged threatened injury to support temporary injunction).

However, the case on which Valenzuela relies does not support standing under her circumstances, as it involved the expansion of an exception to medical licensure, which would put

a previous license holder (orthopedists) in direct economic competition with new license holders (podiatrists). *See Texas State Bd. of Podiatric Med. Exam'rs*, 2004 WL 2556917, at *2. Here, Valenzuela holds a State license to operate a small day-care facility; Dilley and Karnes, located in south Texas over 500 miles away, are twenty-four-hour GROs each with hundreds of residents and subject to a completely different type of licensing. Dilley and Karnes are not and could not be in any direct economic competition with Valenzuela's facility. Valenzuela has not pleaded that she has ever been personally detained at any FRC or that she operates one. Her speculative scenario about parents choosing unlicensed day care due to potentially negative perceptions of day-care licenses such as hers is far too attenuated and speculative to support standing requirements. Simply put, Valenzuela has not pleaded any concrete and particularized injury to herself or her day-care facility as a result of the FRC Rule. *See Brown*, 53 S.W.3d at 305. Accordingly, we conclude that Valenzuela lacks standing to bring this rule challenge.

### *Whether the detainees have standing*

The detainees, none of whom still reside in the detention centers,[5] assert standing based on alleged harm to their minor children, whom they claim will be detained for longer periods of time—which itself causes "grievous harm to children"[6]—and in "dangerous conditions" due to

---

[5] Appellants also assert that the detainees' claims are moot based on the fact that none of them reside any longer in the facilities at issue. Because mootness is a question separate from standing, *see, e.g.*, *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex. 2012), we address the issue of the detainees' standing first and then, if necessary, appellants' mootness argument.

[6] There was evidence adduced at the temporary-injunction hearing from appellees' expert about the psychological effect of detention on children, specifically about how the negative effects—including stress, trauma, and hypervigilance—increase the longer the children remain in detention.

11

the challenged rule's "bedroom-rule waivers" that allegedly "force children to sleep in the same bedroom as adult strangers, exposing them to invasion of privacy and risk of sexual assault." Essentially, the detainees' alleged injury is the harm that they contend will result from lengthier detention and the danger that the bedroom-rule waivers pose—they assert that these "risks to safety suffice to prove Detainee Plaintiffs' standing."[7] *See Texas Ass'n of Bus.*, 852 S.W.2d at 447 (holding that "[a] substantial risk of injury is sufficient" to confer standing). They further contend that the fact the FRC Rule and licensing thereunder will also incrementally benefit them and their children in the form of more rigorous background checks and inspections of facilities does not obviate their standing because the standing test does not require a balancing between alleged harm and benefit; it requires only a showing of harm, even simply "an identifiable trifle." *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) (noting that "injury in fact" element of standing test "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem"); *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (holding that injury requirement of standing inquiry is "qualitative, not quantitative").

While the detainees concede that the *fact* of detention is traceable to the federal government and to ICE (and thus not redressable in this lawsuit against appellants), they maintain

---

[7] The FRC Rule provides that FRCs must comply with the same "minimum standards" applicable to GROs generally, except that FRCs need not comply with the following minimum standards: (1) the maximum of four occupants per bedroom, (2) the prohibition against a child sharing a bedroom with an adult *if the bedroom is being shared in order to allow a child to remain with the child's parent or other family member*, and (3) the prohibition against children of opposite genders sharing a bedroom as long as the children are members of the same family and under the age of six. *See* 26 Tex. Admin. Code § 748.7(c).

that the *length* and *conditions* of detention—which the detainees explicitly challenge—are traceable to the State, which has the authority to issue the FRC licenses and waive the GRO minimum standards, as alleged here. As to the conditions of detention—the alleged danger from "forcing children to share bedrooms with adult strangers"—appellees contend in their brief that the FRC Rule's waiver of bedroom minimum requirements "allows any adult—even a stranger—to sleep in the same bedroom with an unrelated child." Appellees cite to testimony in the record from detainees who claim to have had to share a bedroom with their children in addition to other, unrelated adults at Dilley and Karnes. They also cite to testimony of a twelve-year-old girl who was allegedly groped by an unrelated female adult detainee with whom she was sharing a bedroom.

However, a review of the text of the challenged rule belies appellees' contention that the rule "allows children to share bedrooms with unrelated adults." To the contrary, the FRC Rule explicitly forbids adults to share a bedroom with unrelated children: "A family residential center is not required to comply with all terms of the following Minimum Standards: . . . the limitation on a child sharing a bedroom with an adult in § 748.3361 of this title (relating to May a child in care share a bedroom with an adult?), *if the bedroom is being shared in order to allow a child to remain with the child's parent or other family member*." 26 Tex. Admin. Code § 748.7(c)(2) (emphasis added). That is, the FRC Rule allows for a minor to share a bedroom with the child's parent or adult family member; on its face, it does not allow a minor to share a bedroom with an *unrelated* adult. Simply put, the FRC Rule does not allow for the alleged harmful conditions about which appellees complain and, therefore, appellees have not asserted an injury that is fairly traceable to the FRC Rule's bedroom-rule waiver that is sufficient to confer standing.

13

We further conclude that the length a child is detained—and the alleged harm resulting from longer detention periods allegedly made possible by licensure of the FRCs—is not fairly traceable to the FRC Rule and appellants. Rather, the length of detention is traceable to federal immigration policy and the *Flores* Settlement Agreement's requirement that state facilities detaining minors be licensed. The FRC Rule and DFPS's promulgation thereof are not what permits the allegedly longer detention periods about which appellees complain; rather, the length of detention is determined by ICE policy and is solely within ICE's discretion. *See Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs. Comm'n*, 408 S.W.3d 549, 565 (Tex. App.—Austin 2013, pet. denied) (concluding that economic losses alleged by plaintiff resulted from legislative changes to Medicaid program, not from properly implemented rules effecting those changes). Length of detention is solely the province of ICE; implementation of the FRC Rule cannot determine how long detainees are detained.

Appellees' alleged injury of lengthier detention caused by the FRC Rule is also too speculative to meet the concrete-injury requirement of the standing analysis.[8] *See DaimlerChrysler Corp.*, 252 S.W.3d at 307 ("[I]f injury is only hypothetical, there is no real controversy."). It is ICE that determines where detainees will be detained, not the FRC Rule or the State; were Dilley and Karnes not licensed, we cannot predict whether the detainees would be detained in a facility licensed by another state, whether they would be detained in unlicensed facilities, or whether they would be released. We conclude that the detainees' alleged injury in the form of possible prolonged detention

_____

[8] Moreover, appellees conceded in their motion for summary judgment that the average length of stay at Karnes has actually decreased since the facility became licensed under the FRC Rule.

of their minor children is neither concrete and particularized nor fairly traceable to DFPS or HHSC and is, therefore, insufficient to confer standing.

## CONCLUSION

Because none of the appellees has standing to challenge the FRC Rule, the trial court did not have subject-matter jurisdiction over the cause, and the trial court erred in denying appellants' plea to the jurisdiction. Accordingly, we reverse the trial court's judgment and render judgment granting appellants' plea to the jurisdiction and dismissing appellees' rule-challenge claims with prejudice.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Reversed and Rendered

Filed: November 28, 2018

15